Good morning, Your Honor. May it please the Court, Joshua Salzman on behalf of the Secretary. The preliminary injunction at issue here rests solely on the Court's determination that in the course of obtaining some aggregate earnings information from the Social Security Administration, the Department of Education violated the Privacy Act. But crucially, it's undisputed that the only information sought and obtained by the Department was aggregate earnings information that was devoid of any personally identifying information. The reason But, just a minute. To get that information, the Department produced identifiable information from files as to who had actually filed claims. Is that right? That's correct, Your Honor, but I And it produced it to the Social Security Administration. Social Security Administration then matched those names to identifiable people. The Department, as Your Honor said, the Department took roughly 62,000 borrowers' names and birthdates, sent it to Not just borrowers. Borrowers who were seeking Who were asserting borrower defenses. Right. Okay. Sent that to Social Security Administration. So it's providing, so now people in Social Security know who's asserting the defenses. Then what? So then Social Security Administration uses that information to compile. Those 62,000 individuals were grouped into 79 groups that the borrower associated with programs that people had attended. The Social Security Administration sent back aggregate earnings data for just those They took the actual names of actual people and compared to the actual names of actual people in the Social Security files. Yes, they did, Your Honor. So that was all attached to actual people. It was not anonymous. That piece of it was not anonymous. But, Your Honor, turning back to the text of the Privacy Act, the transmission here was what plaintiffs' allegations What if the Privacy Act isn't about transmission, it's about matching, right? Not just that, Your Honor. With this, with the relevant provision of the Privacy Act, I think you're, when you're talking about matching, you're talking about subsection A8 of the Privacy Act, which defines a matching program in certain limited ways and subject to certain exclusions that are laid out in subsection capital B. Now, there's a list of, I think, about ten provisions in subsection capital B, each of which is expressly defined as outside the definition of matching program. The first of those is a comparison, a match, just as we've been discussing, performed to produce aggregate statistical information or data without personal identifiers. So what you don't look here is that whether or not a match was performed isn't the end of the story. Then you have to look at the product of that match. And you have to look at what came back from the Social Security Administration to the Department of Education. And what came back, it's undisputed, was aggregate statistical data that didn't have personally identifying information for any borrowers. And that's the reason that the Computer Matching Act isn't applicable here. Once we are outside the Computer Matching Act. I mean, obviously, not obviously, but your opponent has an elaborate explanation of why that's not right. That they maintain that the first exclusion doesn't apply when the information data produced, in fact, is used to affect the benefits of participants. And is it true that you in the district court agreed with that? Absolutely not, Your Honor. That's what they're bracing. What we did point to, the one thing that I would say is that the plaintiffs highlighted certain OMB guidance. Now, the statutory text here is quite plain, I think, but to the extent that we want to read this in light of the guidance that OMB issued, OMB has referred to there being an implicit requirement in that first provision that also the information should not be used to take action against identifiable individuals. But OMB further clarifies that, of course, that doesn't mean that you can't affect the rights of individuals as members of a class or group. And that is precisely what happened here. To the extent that you can't do that, you can't do that. No, it isn't precisely what happened here, because you came back and then you matched these numbers to individuals, not to classes or groups. I disagree with that characterization, Your Honor. What happened here was the department wasn't interested in finding out how much individual borrowers were earning. And in fact, they expressly did not want, were not focused on that. What they were interested in was trying to ascertain some objective valuation of the different programs. They then used the data that they obtained from Social Security Administration. They then used, compared it to other data they already had about how, what earnings would be typical if you had attended, gotten a comparable degree at another institution. They did a comparison to try to derive the value of the program. And then they were looking to determine how much relief individual borrowers should get based on the program, not being — And so then you found individual borrowers, right? It ended up with individual borrowers. At three or four steps of remove, Your Honor. But the crucial point here is that they weren't using this as a proxy for the individual borrowers' earnings. They were using this in an effort to determine how much value the program could — was providing in the abstract, not in each individual case. To give Your Honor an example, two people may attend the same institution and have wildly different life outcomes. They may make different choices. They may encounter different kinds of hardships, and their earnings may be very different over the course of their lives. I don't think that means the value of the degree in the abstract is different. It's not a subjective thing. What the Department was looking to do here was to look at large groups of people and say, on average, was this degree conferring some value? In some cases, the answer was yes, and in some, no. But returning to statutory text, if I may, that subsection B-1, I think, is quite clear that as long as you don't have personal identifiers in it, then it's not a matching program. And I think it's telling that subsection B-2, which the district court cited, even though it's not the provision we were relying on here. Subsection B-2 does have the restriction that Your Honor's been discussing. And the district court improperly read it into to B-1. So I do find this language rather mysterious, because the second one includes a statistical project. So what's the difference? Is it a statistical project by definition, statistical, i.e., producing non-identifiable data? Yeah. So here's the key difference between B-1 and B-2. Each has a requirement that the other lacks. B-1 has a requirement that all individually identifying information is stripped out of the product. B-2 doesn't have that. B-2, in turn, has a requirement that's not in B-1, which is the — Well, how do you do a statistical project with individual data? One could imagine that SSA had returned data to the Department of Education here in a different case that still had groups of individual borrower information. You could have listed the Social Security numbers of the different borrowers as being associated with the 79 groups. Then you might be in the B-2 world instead of in the B-1 world. What B-1 does — what B-1 contains that B-2 doesn't is that lack of all of them. But there is — but that's not the only difference in the language. And my understanding is that the argument — I mean, this is kind of a backwards argument because you're going first, but — so I'm making their — repeating their argument just to get your reaction to it. My understanding of their argument is that that's not the only difference in the language. The other difference is that the first one says perform to produce, and the other one says perform to support, the notion being that the first one is the aggregate statistical data is the end product, whereas in two, the research or statistical project is not the end product, it's simply supportive data to some other end. And — go ahead. I'm sorry, Your Honor. I was just going to say, I think the word product means what is the material  from the agency that receives the initial set of data back to the first department. So here, we should be looking — the relevant product is what came from SSA to the Department of Education. Now, there may be downstream uses of a product. One would hope that if government — But that's not the language that's used in sub 2. I'm sorry, Your Honor? That is not the language used in sub 2. The language, I agree, is not — is not completely parallel. I would also point out that all of these provisions are joined by an or clause. If you go to the bottom of the list, you'll see that it's — these are phrased in the disjunctive. So as long as we fall within the plain language of B-1, I don't think the Court needs to necessarily concern itself with the relationship with B-2. I think if we look to B-2 at all, the relevant inferences to draw is just — Your — go ahead. Is — I was just going to say, the relevant inference is just that B-2 has that requirement that is absent from the text of B-1. Right. There are two other major issues that I understand at large. The district judge — there's also issues about the routine use. Well, there is — And thirdly, in the background, is an arbitrary and capricious challenge. That's right, Your Honor. So I'll tick through those quickly. On the routine use, neither in their complaint nor in their preliminary injunctions papers did plaintiffs clearly raise any argument other than the matching program argument. When it became apparent at oral argument that they were suggesting that the general restrictions on disclosure of records were potentially at issue, we raised a routine use defense. The district court, I think understandably because it hadn't been briefed, didn't even acknowledge the argument. Accordingly, I think it would be appropriate for this Court to remand, for the Court to consider in the first instance. But if this Court — But the district court did rule in general terms. The court simply said the department has not even raised an objection under B-1 to B-12. They — the district court — if you read the opinion, the district court plainly said the only defense that the department was asserting was an aggregate statistical data defense. The district court did not acknowledge the routine use defense, which had been raised at oral argument. That's at excerpts of record, I think, 100 to 105. And if this — so I think the Court could just remand based on that. But if the Court wants to decide in the first instance the disclosure here was compatible with the purposes of collection because this was in furtherance of administration of the student loan program, there was a published system of records notice. I'd refer the Court to page 81, Fed Reg, page 60, 686, that says that there's a — that disclosure to other Federal agencies related to the discharge of student loans. And there was a specific disclosure to the individual borrowers, both on the master promissory notes the borrower signed when they took the loans, that's ER-136, and again on the attestation forms that the borrower signed when they submitted their borrower defense claims, that's at ER-145. I see I'm down to two-and-a-half minutes. Breyer, I'll give you time. But on the — I'll give you ample time. Okay. On — so if I can pivot to the arbitrary and capricious standard, I — two threshold things I want to point out. One is, this is a case where not only was this an issue the district court didn't rule against us on, it affirmatively ruled in favor of the government. It kind of — the district court's opinion on this seems to me just elides the — the important issue. I mean, it goes on about how it's not arbitrary and capricious to want to do something like this, and that's fine. But the question is what was actually done here, as to which there's one opaque paragraph, which is not terribly convincing to me. As to where — I mean, in terms of where these numbers — it certainly seems at least plausible to say that what was being compared here is where apples and oranges, and that the number that was being used as the comparator was being taken out of context entirely in terms of what it was — its role, which was a comparison between wages and costs, and to take — in other words, the — the schools that had passed the gainful employment test didn't pass it based on — necessarily on the wages that were earned. It was a comparison of wages and — and costs, so that isn't very helpful. And then there's — there are a bunch of discrete considerations as to what was being done here that the district court really didn't deal with. I — there's a lot to unpack there, Your Honor. I'd — I'd like to walk through those concerns in order. But the — your last point, that the district court didn't deal with them necessarily, I think might underscore why this Court as a prudential matter shouldn't even reach the — the issue, particularly in the absence of a cross-appeal in this preliminary injunction posture. Kagan. What does a cross-appeal have to do with it? A cross-appeal — wait a minute. A cross-appeal is if you're trying to upset the judgment. You're not trying to upset the judgment. Respectfully, Your Honor, I'm not totally sure I agree with that characterization. I think to the extent that they are running an argument, for example, that as a matter of law, they are entitled to whatever relief would be available under California law, and that as a matter of law, under California law, they are entitled to a full discharge, I think they are in essence — That's not what I'm talking about. Well, they've — they've made two arbitrary and capricious challenges. And I'm — I'm describing the second, not the first. To the extent that I'm happy to explain why, if the Court wants to reach the first one, I agree it has jurisdiction to do it as a — I think there are prudential considerations that might weigh against it. But if — if the Court wants me to, I'm happy to explain why, under the deferential arbitrary and capricious standard. What the Department did here was entirely reasonable. Keep in mind, the rule they're asking for isn't any more individualized. What the — what the plaintiffs are asking for is an assumption that everybody got zero value. I don't want to know about the rule they're asking for. I want to know why this rule is not arbitrary and capricious. Okay. Substantively. Of course, Your Honor. As — as is explained in the declaration we've put in the record from James Manning at ER 109 to 111, the Department started — took a look at this program and realized that — that they had in the past been assuming that there was no value conveyed by a Corinthian education. The Department said maybe that's not right. I don't want to know that either. I thought I made it clear that I understand the impetus. I want to know what — why what they actually did isn't arbitrary and capricious. Of course, Your Honor. So what they did was — and this is, again, laid out at page ER 109. What they — they said that the complaint people had was that they hadn't gotten value from their education as determined by the higher earnings they had expected and not gotten. And as a result, what they said is what the Department sought to do — and keep in mind, they're trying to adjudicate 100,000 claims here and are looking for an administrable way to do that that will leverage to the extent possible data they already have. What they said is how — what's a good proxy for figuring out whether or not people were getting the earnings they could have reasonably expected. And the way they did that was they said, let's do this on a program-by-program basis, and we'll look at the earnings that Corinthian students got from their program. Okay. So what defined what a program was? What defined what a program was? How are programs defined? So there was a preexisting taxonomy called CIP codes. I think it's — I'm not going to remember the acronym correctly, Your Honor. I think it's ER-218 — ER-118. There's a memo — there's a declaration that walks through all of this, but there's a taxonomy of codes that are how the Department had already organized its data with the — I believe it's the gainful employment data that was already in its possession about various other institutions. So what they did was they grouped the Corinthian programs by their CIP code and by their credential level. So to distinguish an associate's degree from a certificate program. In a particular field of study, they then grouped the students, and that's how they arrived at these 79 groups. They requested the data, and then they did a comparison to comparable CIP codes and credentials elsewhere. But that's the question. What's the comparison and what's — and why are — well, in any event, it's a lot of detail which probably doesn't work very well in oral argument. But it didn't see — I mean, maybe the answer is this has not been very well briefed, and if we were to go forward with it, we would want further briefing. But it did seem to me that it was — there were some substantial questions raised. Okay. To the extent the Court is interested in the process, there is a declaration in the record from Mr. Pionis — Yeah, I know. I've read it. — that describes it. Why don't you — I'll give you some time for rebuttal. Thank you, Your Honor. Good morning, and may it please the Court. Josh Rovinger from the Harvard Legal Services Center on behalf of the student class. I'm going to start right where the Department and Judge Berzon left off, in particular why the Department's actions here were arbitrary and capricious, even assuming that value could be used as a viable metric for borrower defense relief. We have to start with the premise the Department tells us to, which is at the beginning of the methodology memo at ER-124. It says it's rooted in a determination of the value of claimants' CCI education. The Department's methodology fails to accomplish that in several different ways. First, there are significant problems with respect to the numerator, or the group of Corinthian students it says are representative of the class. For example, the Department picks July 31, 2018, as an arbitrary cutoff from which it's going to use earnings data to adjudicate all of these claims. Yet the Department has not explained how borrowers who applied before that date are actually representative of the entire class here. Similarly, the — But when it went to the Social Security Administration, what years was it getting data for? I'm sorry, Your Honor? When it asked the Social Security Administration for data, what years was it getting data for? So it asked for data from 2014, which is another significant problem. We have students in the class, including Ms. Jennifer Craig, who were attending school at that very time. But the Department does not explain how the earnings from that year can accurately reflect the experience and value from someone who was attending school at that very time. Indeed, during 2014 and 2015, the Department was forced to take aggressive oversight steps towards Corinthian because of Corinthian's increasing malfeasance. But that's not the only problem with respect to the class of people it selected. The Department has completely ignored distinctions among members of the class that would connect to whether the individual — their earnings and their job actually relate to Corinthian. For example, we have students who have jobs because they had a job before they attended Corinthian or have a job outside of their field of study. Now, the Department fined Corinthian $30 million for adopting those exact same flaws in their job placement rates. In other words, the Department has already determined that those distinctions matter when it — when it — when it reflect — as to whether it reflects whether an individual's job and their earnings connect to their experience at Corinthian. More fundamentally, though, as Judge Berzon pointed out in her questioning, there's a significant comparator problem here. The Department says that we're going to take the earnings from these Corinthian students as the metric of the value that they received. But then the Department says, we're going to compare them against schools that pass a debt-to-earning metric. A school can pass the debt-to-earning metric with $1 in earnings and $0 in debt. For instance, Austin Community College's $1, but who had $0 in debt. It just fundamentally makes no sense to compare earnings to schools that pass the metric that isn't driven by earnings. In addition to the Department's actions being arbitrary and capricious — Roberts. Were these arbitrary and capricious arguments presented in writing to Matt Strait, Judge Kim? They were, Your Honor. We briefed them in full in our initial memorandum to the Court and then again in our reply brief. In fact, the Department responded, and the Court did in fact rule, and so it would be entirely appropriate for this Court to reach the issues. It strikes me in listening to you that some of the matters that you're complaining about have something to do with the matching problem. In the sense that the reason for the matching restrictions, as I understand it, is precisely so that — largely procedural. I mean, that is, that there are concerns about computer matches as to the accuracy of both sides of the match and inability to raise issues regarding them. And at least some of what you're saying with regard to the class that was chosen and the groups that were chosen and what the Social Security data that was matched was really reflect similar concerns. Is that right? I think that's right, Your Honor. Although I — But what do you do with the language of the statute then? I mean, so go to the matching issue at this point. And then I would like you to get to the routine use issue eventually. Absolutely, Your Honor. So I'll start with the matching program issue. And first I'll start with the definition in A-1 and then move on to the B-1 exemption. A matching program is ultimately defined by the purpose for which the data disclosure in the match occurs. Indeed, the Office of Management and Budget expressly warns departments not to disguise their real purpose in disclosing the data. Despite the department's post hoc litigation attempts to do exactly that, they actually confirm in their brief that the purpose here was to decide on individual claims. They say in their reply brief at 15 to 16, quote, plaintiff's data was disclosed for the purpose of resolving plaintiff's own claim. In other words, the output of the matching program was used to directly drive individual benefits decisions. What that means with respect to the aggregate statistical data exemption is that because that exemption is also defined by its purpose, the two cannot be — Well, it doesn't say purpose. It does not say purpose, Your Honor, but it does say to — perform to produce aggregate statistical data. It's aimed at a different thing. So on the one hand, you have matches for the purposes of benefits determinations, and then you have those that are done to produce aggregate statistical data because an agency wants to learn something from the data. Well, but it doesn't say that. I mean, that's — it stops, right? Produce aggregate statistical data. I mean, one question I have is, does it make any difference that — and I'm not sure it does — that internally the Social Security Administration was doing an identified match, even though what it transmitted wasn't an identified match? Does that make any difference? I think it makes a difference with respect to whether it satisfies the definition of A-1, but I don't think it would otherwise impact the aggregate statistical data exemption's applicability. Because it only applies to what's transmitted over. Because in our view, Your Honor, that exemption only applies when the end goal of the agency that's seeking the data is to get aggregate statistical data. But you don't — what I'm wondering is, can you read that subsection as applying when the match is done without identifiable data? Here the match was done with identifiable data. There are other ways to do that by anonymizing the information before you compare it. But that's not what happened here. It was — the match was done with identifiable data. Does that make any difference? So I do think that it's the output that comes back and whether that has personal identifying information. Okay. That's the key there. But I would still say that there's evidence, particularly in the OMB's analysis of the statute, that there's a critical distinction between benefits determinations and the idea of producing data on its own for the purposes of learning something from that data or creating evidence-based policy from that data. So for example, the GE agreement that the department misused here, one of the purposes is to release data to the public so the public can learn something from it. That match is performed to produce that aggregate data. Similarly, the department disclosed that data because it wanted to make policy down the road. That too is to produce the aggregate statistical data. I think maybe even moving outside of the education context, I can offer an example that illustrates the distinction between a match for the purposes of an eligibility determination and to produce aggregate statistical data. So suppose the Veteran Affairs Administration had a bunch of applicants from a few locations and wanted to learn something about their employment. If they did so and they disclosed data to another agency organized by zip code because they wanted to eventually create policy with respect to the benefits that they may offer down the line, that would be a match that's done to produce the data. At the point, though, that the VA was doing such a match because it was going to use the output to directly decide whether individuals in certain locations received the benefit at all, that's a match for the purposes of the benefits determination. But it's not just that the department violated, in our view, that provision of the law. There's also this significant routine use violation. Kagan. Can you tell me, let me just see if I can get, on the matching thing, and there's a, I know what the definitional section is. What's the operative section that says what you can do with matches or not do with matches? I'm not sure I understand the question. Well, there's a definition of a match, but there must be something in the statute that says you either can or can't do matches, or where is that? So, subsection P, R, and O deal with the additional requirements that are imposed on matching programs. So it's not so much a question of whether you can do them or not. It's whether you have to follow certain procedural protections because you're engaged in a matching program. So if the department had complied with that law here, for instance, there would be an information sharing agreement that was directly on point for the department to use. Moreover, the department would have been providing individuals an opportunity to be, one, notified about the output of the matching program, and two, to contest the findings of the matching program. Our class members were deprived of that procedural right because the department did not comply with the various procedures required by the law. In addition, though, to the matching program violations, there are, as Your Honor asked about, significant routine use violations in that the department here took data from one individual to decide other individuals' claims. I think the department may be making one of two arguments. It's not entirely clear to me. First, the department may be saying that it didn't actually do that. It only used the data to decide that own individual's claim. But that's the problem. I mean, it's one or the other. Either it's aggregate and, therefore, not individual or it's individual. So — Exactly, Your Honor. The department's in a catch-22. And I think why they're forced to concede in their reply brief that the data was disclosed for the purpose of resolving plaintiff's own claim. But it wasn't just used for that purpose in that the department also disclosed data for individuals whose claims had already been decided. At ER 117, paragraph 17, the author of the memo testifies directly to that. In other words, those individuals' data were clearly being used to decide other individuals' claims. Alternatively, the department may be saying that because it had one valid routine use, it could use the data to decide other individuals' claims. But that is both inconsistent with the plain terms of the statute and would completely undermine the various sections of the statute relating to routine use, including that agencies publish each routine use and give actual notice to individuals about each routine use. But they claim to have made a generic disclosure, and that's not good enough? So for the notice directly to the individual on the attestation form, that's not good enough, Your Honor. As for the issue of the systems of records notice, we'll concede for purposes of argument that the — what the department used here was the common services of borrowers, although we would note just for future litigation purposes that Undersecretary Manning in November 2017 at the negotiated rulemaking expressly said that the department lacked a systems of record notice when it comes to borrower defense data. But in any event, even assuming that the department used the common services borrowers' systems of record, one, there's nothing in that systems of record notice which would put an individual on notice that their data could be used to decide another individual's claim. And two, it just shows another way in which the department utterly misused the GE agreement that it had with the Social Security Administration. That agreement expressly noted that the systems of records the department was going to use was going to be the National Student Loan Data System, which is obviously not what the department did here and what the department used, and just another way that the department bamboozled the Social Security Administration in an effort to obtain this data. Unless there are further questions for the reasons discussed and for the reasons in our brief, we urge this Court to continue protecting these students and affirm the injunction. Okay. Thank you. Two minutes. Thank you, Your Honor. Sure. I'll be quite brief. On the matching program argument, I just want to quickly address Judge Berzon's concern that perhaps the other operative provisions of the statute might restrict what happened internally at the Social Security Administration. If you look at the definition of matching program, it requires the comparison of records from two different systems of records. This is in subsection A. If we're not within the definition of matching program, then none of the other I'm sorry. There was a comparison. I mean, it just strikes me that in terms of the purposes of the and the details of the matching program system problem, that this does seem to fit quite nicely. I mean, I here's the definition. Two or more matching program means any computer of two or more automated systems of records or a system of records with non-Federal records. So that happened here, right? It did. For the purpose of establishing or verifying, et cetera. That happened. The Social Security Administration within it did this identified comparison of these individuals and their earnings and produced that list and then used that to create aggregated data. But where is the notion that to have a matching program, the fact that you have what matters is what goes over to the other agency. It's the product of the match. So the Social Security Administration has a list of Social Security numbers, a list of individuals, and their earnings information. They received from the Department of Education the borrower information. I understand. But when we start discussing the arbitrary and capricious and he starts articulating what their problems are, they're exactly the same kinds of problems that the matching program concern was supposed to deal with, i.e., you're comparing things that aren't really comparable or the data lists are inaccurate or whatever. And so, but you want us to disregard whatever might have been wrong with the actual comparison between the DHS records and the whatever procedural rights might have flowed from the non-anonymous comparison between the department's records and the Social Security Administration's records, which were not anonymous and were identified, and then were massaged into aggregate statistical data. But why does that matter that that second step, the first step already happened? Well, the first step matters, Your Honor, for purposes of the routine use argument. I don't think it matters for purposes of the Computer Matching Act. I think there are two separate sets of Privacy Act provisions potentially implicated here. One is the computer matching argument. That's actually the argument plaintiffs raised in their preliminary injunction brief. That, you have to think about the product. And by that, I mean the ultimate product sent from the Social Security Administration from SSA back to the department. But that's what I'm asking you. Where is the notion that it's what goes back to the department that matters? Where is that? Well, even internally at the department, the product of the comparison is the aggregate statistical data. But not inside the Social Security Administration. I think, as a threshold matter, whoever is doing the comparison, just to fall within the initial definition, is going to need to have both sets of records and have it not be anonymous. But they can be. But they could be anonymous. I don't see how you could do the comparison. That's often how research is done. You assign numbers to people and strip the information of any identifying information, but that isn't what happens here. But if the borrower information were entirely stripped of identifying information, you couldn't compare it against the earnings records. And that's always going to be the case. If you're talking about comparing two systems of records, then a system of records by definition has records in it. Records have personally identifying information. That's in A-4, the definition of record. That's individual information about an individual with an identifying particular about the individual. So if you're going to be comparing two systems of records, you are necessarily going to have identifying particulars in both systems. Now, as a result of that. I'm not sure that's true. Go ahead. To the extent the Court has concerns about the material that was sent from the  We agree that that falls within the general scope of disclosure of a record from a system of records, but that's where the routine use argument comes up, which the District Court didn't even reach. Okay. Thank you, Your Honor. Thank you. We appreciate your arguments this morning, and the matter is submitted. Safe travels. Thank you.
judges: Paez, Berzon, Feinerman